CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 1 2 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

GARY NEAL SADLER,          )
     Plaintiff,           )
                        )
v.                     )     Civil Action No. 7:04cv00580
                        )
RICHARD YOUNG, et al.,     )
     Defendants.        )     By: Hon. Michael F. Urbanski
                        )     United States Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Gary Neal Sadler, a Connecticut inmate proceeding pro se, has filed this civil rights action pursuant to 42 U.S.C § 1983, with jurisdiction vested under 28 U.S.C. §1343.[1] Plaintiff alleges that while incarcerated at Wallens Ridge State Prison ("WRSP") he was subjected to an excessive amount of environmental tobacco smoke, excessive force, and on multiple occasions was charged with false disciplinary infractions and was subsequently improperly convicted on those charges.[2] This matter is now before the court on defendants' motion for summary judgment. Upon review of the record, the undersigned finds that Sadler has not presented any genuine issue of material fact and that the defendants are entitled to judgment as a matter of law and, thus, recommends that defendants' motion for summary judgment be granted. It is further recommended that this action be dismissed as frivolous, as it fails to state a cause of action on which relief can be granted, and therefore, such dismissal should be considered a "strike" under 28 U.S.C. § 1915(g).

---

[1]At the time of the alleged incidents, although Sadler was imprisoned pursuant to a judgment in the state of Connecticut, he was housed in the Wallens Ridge State Prison in Virginia.

[2]By Order entered March 3, 2005, the court dismissed Sadler's other claims and afforded Sadler the opportunity to amend the claims which are now before the court.

# I.

Sadler alleges that on his arrival at WRSP he informed correctional officers that he did not smoke and was advised that he would be placed in a tobacco-free housing unit. However, Sadler alleges that from January 20, 2000 through March 24, 2000, he was celled in a housing unit where smoking was permitted. Although Sadler claims that four inmates in nearby cells smoked, he admits that his cell mate did not smoke. Plaintiff contends that as a result of exposure to this smoke he immediately began suffering from headaches and sinus problems, which continue to plague him.

Sadler claims that his requests to be transferred to a non-smoking unit were ignored and/or denied. Accordingly, on March 20, 2000, Sadler decided to purposefully disobey a direct order so that he would be moved to the non-smoking segregation unit. That day, Sadler refused to obey a direct order to exit the shower. However, he later left the shower and returned to his cell. Approximately twenty minutes after he returned to his cell, Sadler alleges that Correctional Officer K. Count ordered him to put his hands through the cell door tray slot so that his hands could be cuffed and he could be moved to the segregation unit. Sadler alleges that he complied with the order, but that Count was overly aggressive towards Sadler and "violently" grabbed Sadler's wrist and applied the cuff too tightly. Sadler "naturally" jerked his arm away from Count, but Count refused to release Sadler's wrists, causing the cuff to cut into Sadler's wrist and break the skin. Count then fastened the handcuff on Sadler's other wrist, and Sadler was escorted to the segregation unit. Sadler claims that as a result of the too tight cuffs, his wrists became swollen and bled.

2

Sadler was subsequently charged with attempted assault as a result of the tray slot incident, and disobeying a direct order for his failure to promptly exit the shower stall. Sadler alleges that during the institutional hearing on these charges he was not allowed to present evidence on the attempted assault charge which supported his defense that he was a victim of excessive force and that his reaction was "natural," and was not an attempted assault. However, Sadler admits that he testified at the hearing in his own defense. He also claims that he wanted to plead guilty to the disobeying a direct order charge so that he would receive a more lenient sentence; but, instead, he was found guilty of the charge and sentenced to the maximum penalty. Sadler now claims that the sentences he received on these charges were improper because after he was convicted and sentenced, the Institutional Hearing Officer, Defendant Slayer, indicated that she did not "like inmates that assault her officers." Sadler claims Slayer's statement felt like a threat; and, thereafter, he filed numerous complaints and grievances related to her alleged bias. Sadler further contends that this bias against him was evident in all subsequent disciplinary hearings over which she presided.

Sadler claims that on or about August 9, 2000, he began to file complaints regarding what he deemed to be improper comments made by Correctional Officer King. Sadler claims that prison officials ignored his complaints and that King continued to engage in improper conduct towards the plaintiff. Accordingly, on August 24, 2000, Sadler decided that in response to King's "improper" comments, he would also act or engage in an improper manner towards King. Sadler alleges that in response to his admittedly inappropriate behavior, King sprayed him in the face with a cleaning solution. Sadler's claims that this caused a burning sensation in his face and one eye. Sadler then claims he pushed the emergency call button to request medical

3

attention. However, he was informed there was no emergency. Thereafter, Sadler filed an emergency grievance for medical attention, was examined by a nurse, and was told to rinse his eyes with water. Sadler did not make any further requests for medical attention related to this issue.

Sadler next alleges that on August 14, 2000, Defendant Correctional Officer O'Quinn, filed an improper and retaliatory disciplinary charge against him for failing to shave. Sadler asserts that he did not shave because he had developed a rash on his neck and face and had sought a medical "no shave pass" due to the irritation, but that request had been denied. Sadler asserts that instead of investigating Sadler's "reasons" for not shaving, O'Quinn filed a disciplinary report and falsely alleged that Sadler had cursed him when O'Quinn ordered Sadler to shave. On August 21, 2000, Sadler was convicted in an institutional disciplinary hearing of disobeying an order to shave. Once again, Slayer oversaw the proceedings. Sadler alleges Slayer exhibited her bias by refusing to allow him to put on evidence which explained his refusal to shave; and, thus, claims the hearing and sentence were improper.

Next, Sadler claims that on September 2, 2000, his toilet "just" began to run nonstop causing his cell to flood. Accordingly, the plaintiff pressed the emergency button, only once, and asked the responding correctional officer, Defendant Flanery, to send someone to fix the toilet. Sadler claims he was told that someone would be sent, and minutes later King entered Sadler's cell and fixed the toilet. Subsequently Sadler was charged and convicted of repeatedly pressing the emergency button. Again, Sadler claims that the institutional disciplinary hearing and sentence were improper because Slayer was biased against him and refused to allow him to

4

present evidence supporting his defense that this charge was false and was made in retaliation for his complaints against King.

Also on September 2, 2000, Sadler received another institutional charge for failing to obey an order to shave. Sadler claims this charge, initiated by Defendant Correctional Officer Rich, was made in retaliation for plaintiff's complaints against other officers. However, Sadler admits that, once again, he refused to shave on the date in question.

## II.

In support of their motion for summary judgment, defendants have attached Sadler's disciplinary and medical records, as well as affidavits from multiple prison employees explaining the institutional tobacco policy and refuting Sadler's claims of retaliation and excessive force.

Defendants' affidavits establish that, in 2000, WRSP had in place an institutional tobacco policy which prohibited smoking in hallways, conference rooms, restrooms, medical treatment rooms, visiting areas, food preparation areas, the gymnasium, vans, busses, and classrooms. Further, based on limited space in the non-smoking dormitories, inmates with a non-smoking preference were celled with a non-smoker and were placed on a waiting list for a vacancy in the non-smoking dormitory.

Sadler's medical records reveal that Sadler did not voice any medical complaints regarding headaches, sinus problems, dizziness, or any other medical malady while imprisoned at WRSP related to exposure to tobacco smoke. Further, those records show that on March 24, 2000, Sadler was examined by a nurse in response to his complaint that his handcuffs were applied too tightly. However, the nurse found Sadler had only a superficial cut on his left wrist,

5

which she cleaned and to which she then applied a triple antibiotic ointment. No further treatment was necessary and Sadler did not voice any additional complaints regarding pain or discomfort in his wrists or arms related to the incident. Those records also reveal that on August 24, 2000, Sadler's eyes were examined by a nurse following his complaint that an officer had sprayed cleaning solution in his eyes. The nurse noted that Sadler was alert and appeared to be in no obvious discomfort. Moreover, his eyes were clear and Sadler denied having blurred vision. Sadler was instructed to rinse his eyes with water and notify nursing staff of any further problems. However, Sadler made no other complaints regarding eye discomfort.

Sadler's disciplinary records reveal that after he was charged with disobeying a direct order and attempted assault on a correctional officer for his actions on March 20, 2000, Sadler refused to accept a pre-hearing penalty offer and pled not guilty to both charges at the institutional hearing. Further, following his conviction on these offenses he was sentenced to 12 days isolation and 12 days loss of good time. However, following his convictions for failing to obey a direct order to shave on August 14, 2000, failing to obey a direct order regarding pushing the emergency button on September 2, 2000, and failing to obey a direct order to shave on September 2, 2000, he was sentenced to only five days isolation, a thirty day loss of television and radio privileges, and ten days isolation, respectively.

### III.

Upon motion for summary judgment, the court must view the facts and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355 (4th Cir. 1985). Summary judgment is proper

6

where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 47 U.S. 242 (1986).

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the adverse party's pleadings. Instead, the adverse party must respond by affidavits or otherwise and present specific facts showing that there is a genuine issue of disputed fact for trial. Fed. R. Civ. P. 56(e). If the adverse party fails to show a genuine issue of material fact, summary judgment, if appropriate, may be entered against the adverse party.

### A.    Environmental Tobacco Smoke ("ETS")

Sadler alleges from January 20, 2000 through March 24, 2000, he was celled in a housing unit where smoking was permitted, even though prison officials knew he did not smoke. Sadler claims that as a result of his two month exposure to ETS, he immediately developed and continues to suffer from chronic headaches and sinus problems. However, Sadler admits that during that period, his cell mate did not smoke and only four inmates in nearby cells smoked. Moreover, during this period Sadler did not make any complaints to medical staff regarding his alleged headaches or sinus problems, nor did he voice any specific medical complaints related to exposure to smoke.

7

While the Eighth Amendment does protect prisoners from cruel and unusual living conditions, an inmate is not entitled to relief simply because of exposure to uncomfortable, restrictive, or inconvenient conditions of confinement, for, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). As a result, in order to state a claim of constitutional significance regarding prison conditions related to ETS, a plaintiff must demonstrate that due to the exposure he has sustained a serious or significant mental or physical injury and that prison officials were deliberately indifferent to such health threats. Wilson v. Seiter, 501 U.S. 294 (1991); Strickler v. Waters, 989 F.2d 1375, 1380-1381 (4th Cir. 1993). Furthermore, to prove an Eighth Amendment violation based on a serious risk of future harm related to exposure to ETS, a plaintiff must show that he was exposed to unreasonably high levels of ETS, that modern society will not tolerate any exposure to this risk, and that prison officials were deliberately indifferent to this risk. Helling v. McKinney, 509 U.S. 25, 35-36 (1993).

Although Sadler's limited exposure to ETS for that two month period in 2000 may have been inconvenient and unfortunate, Sadler has not demonstrated that because of those conditions, he has sustained a serious or significant injury. Sadler alleges that he suffered and continues to suffer from headaches and sinus problems; however, Sadler did not file any requests for medical treatment or voice any complaints to medical personnel regarding ETS or his alleged symptoms during the brief period he was housed in a smoking unit nor at any other time while housed at WRSP. The absence of any medical documentation of Sadler's alleged headaches, sinus pain, or any other symptom related to exposure to ETS, weighs heavily against a finding that he suffered

8

any injury. See Stanley v. Hejirika, 134 F.3d 629, 637-38 (4th Cir. 1998)(finding a constitutionally insignificant injury where medical records did not substantiate prisoner's claims).

Furthermore, Sadler has failed to allege facts which suggest that he is at risk of future harm related to his limited exposure to ETS. In Helling, the court found that a prisoner who had previously been celled with a "five-pack-a-day" smoker, was not subject to a serious risk of future harm related to exposure to high levels of ETS while housed in that cell because his exposure was not prolonged and he had since been transferred to another cell. Id. at 36. Here, Sadler admits that during the two months he was incarcerated in the smoking unit, he was housed with a non-smoking inmate and only four of the sixteen inmates next to, above, and below his cell, smoked. Further, Sadler does not dispute defendants' assertion that inmates generally complied with the institution's tobacco policy which prohibited smoking in hallways, conference rooms, restrooms, medical treatment rooms, visiting areas, food preparation areas, the gymnasium, vans, busses, and classrooms. Sadler does not allege that he has was forced to share a cell with a smoker, much less one who smoked five packs a day, nor that he was exposed to similarly extreme level of ETS between January 20, 2000 and March 24, 2000. Therefore, the court finds that Sadler cannot establish that he is at future risk of harm due to the limited amount of ETS to which he was exposed. See Id.

Additionally, even if Sadler could establish that he faced some future risk of harm due to ETS, he has not presented any evidence which establishes that prison officials ignored his plight. Sadler does not contest the defendants' assertion that his cell mate and housing placement were based on his preference for a non-smoking unit and to limit his exposure to ETS, that he was

9

placed on a waiting list for a cell in a non-smoking unit, and that had he not been moved to the segregation unit for disobeying a direct order, he would have been moved to a non-smoking cell as soon as feasible. Further, the record establishes prison officials enforced an institutional tobacco policy which reduced ETS throughout the entire prison. Accordingly, it is clear that prison officials were not deliberately indifferent to Sadler's concerns regarding ETS. Therefore, the undersigned recommends that Sadler's claims related to exposure to ETS be dismissed for failure to state a claim upon which relief may be granted.

## B. Excessive Force Claim

Sadler claims that Correctional Officer Count violated his right to be free from cruel and unusual punishment by securing Sadler's handcuffs too tightly on March 20, 2004.[3] To establish an Eighth Amendment excessive force claim against a prison official, an inmate must satisfy a two-pronged standard comprised of both a subjective inquiry (whether the defendant acted with a sufficiently culpable state of mind) and an objective inquiry (whether the harm plaintiff suffered was sufficiently serious enough to amount to a constitutional violation). Williams v. Benjamin, 77 F.3d 756, 761 (4th 1996).

The subjective component of an excessive force claim requires an inmate to demonstrate that the force used by an institutional official "inflicted unnecessary and wanton pain and

---

[3] Defendants assert that Correctional Officer Count was previously dismissed from this suit; and, thus, he was not joined in the motion for summary judgment. In response, plaintiff asserts that he did not intend to raise a new claim of excessive force against Count, rather only that he wished to recount the incident in support of his claim that he received an improper disciplinary charge related to the alleged incident. However, the court finds that whether or not Sadler was properly or falsely charged with a disciplinary infraction following this confrontation specifically relates to the alleged use of excessive force and, accordingly, will address the same.

10

suffering." Hudson v. McMillian, 503 U.S. 1, 7 (1992).  In evaluating such a claim, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. (quoting Whitley v. Albers, 475 U.S. 312, 32-21 (1986)).  The Supreme Court and the Fourth Circuit have set out the following factors to consider in determining whether a prison official acted maliciously and sadistically: "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Hudson, 503 U.S. at 7 (1992) (quotations omitted); Williams, 77 F.3d at 762.

Also, the inmate must prove the corrections official's actions were "'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley, 134 F.2d at 634 (quoting Hudson, 503 U.S. at 8).  Although there is no requirement that an inmate suffer "serious" or "significant" pain or injury to demonstrate that a malicious or sadistic use of force was employed, he must allege "more than a de minimis pain or injury." Norman v. Taylor, 25 F.3d 1259, 1263 n. 4 (4th Cir. 1994).  "[A]bsent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis." Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998).  However, a de minimis physical injury may amount to an Eighth Amendment violation if the force used was of the sort "repugnant to the conscience of mankind." In Norman v. Taylor, the Fourth Circuit stated:

> We recognize that there may be highly unusual circumstances in which a
> particular application of force will cause relatively little, or perhaps no, enduring
> injury, but nonetheless will result in an impermissible infliction of pain. In these
> circumstances, we believe that either the force used will be "of a sort 'repugnant

11

to the conscience of mankind,'" and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury.

25 F.3d at 1263, n. 4 (citations omitted).

According to Sadler, Count ordered him to put his hands through the cell door tray slot so that his hands could be cuffed and he could be moved to the segregation unit. Sadler alleges that he complied with the order, but that Count was overly aggressive, "violently" grabbed Sadler's wrist, and applied the cuff too tightly. Sadler then claims that he "naturally" attempted to yank his arm away from Count, but Count refused to release Sadler's wrists, causing the cuff to cut into his wrist and break the skin, and then fastened the other handcuff. Although Sadler claims that as a result of the too tight cuffs his wrists became swollen and bled, his medical record reveals that he had no signs of swelling and only a superficial cut on his left wrist which required minimal medical attention. Moreover, Sadler made no further complaints of injury or pain in his wrists following the incident. Accordingly, the court finds that the injuries Sadler alleges to have suffered are de minimis and do not amount to a constitutional violation. See Stanley, 134 F.3d at 637-38.

Furthermore, even if Sadler had suffered something more than a de minimis injury, such injury would not have been the result of action repugnant to the conscience of mankind. To meet the subjective component of an excessive force claim, Sadler must demonstrate that the force used against him was not applied in a good faith effort to restore order, but rather with malice as a punitive measure in an effort to cause him harm. See Whitley, 475 U.S. at 320-21. Sadler admits that immediately prior to his placement in restraints he had purposefully disobeyed a direct order. Moreover, Sadler admits that while Count was fastening the handcuffs he tried to

12

jerk his arms away from Count. Accordingly, the court finds that it was both reasonable and necessary for Count to use some amount of force to hold Sadler's wrists until the restraints were fully secured. As such, the undersigned finds that Sadler has failed to allege sufficient facts to satisfy the objective component of an excessive force claim.

As noted above, Sadler did not suffer any serious or significant harm as a result of Count allegedly fastening Sadler's handcuffs too tightly. Further, the record establishes that Sadler purposefully and knowingly failed to obey a direct order, resisted Count's efforts to restrain him, and that Count used a reasonable amount of force to restrain Sadler in order to fully secure the restraints. As such, the undersigned finds that Sadler has not presented any question of material fact as to this claim of excessive force and that the defendants are entitled to judgment as a matter of law on this issue.

## C. Disciplinary Charges

Sadler alleges that in response to his complaints regarding correctional officers' allegedly improper conduct, he was subjected to retaliatory disciplinary charges, was unable to fully present a defense at his institutional hearings on those charges, and was subsequently forced to endure excessively harsh penalties. Specifically, Sadler challenges the following institutional charges and sentences imposed: disobeying a direct order and attempted assault on a correctional officer on March 20, 2000; disobeying a direct order to shave on August 14, 2001; disobeying a direct order to shave and disobeying a direct order to not push the emergency call button in his cell unless there was an actual emergency on September 2, 2000.

13

Although the Fourteenth Amendment does afford prisoners some due process rights, when a defendant is lawfully convicted and confined to jail, he loses a significant interest in his liberty for the period of the sentence. Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). Such confinement is necessarily subject to the broad discretion of those parties managing the jail. Id. However, the confinement does not strip the inmate of all of his liberty interests. Id. "These interests will be generally limited to the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Changes "in a prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." Gaston, 946 F.2d at 343. Furthermore, such changes are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and effectively. Id.

In this case, Sadler fails to allege facts indicating that he has been deprived of any federally protected liberty interest without due process. Sadler alleges that he was falsely charged with various institutional infractions and subsequently denied the opportunity to put on evidence establishing that the charges were false and/or retaliatory in nature. An inmate is afforded procedural protections, including the right to call witnesses and/or present evidence in his own defense only when the loss of statutory good time credits or some other liberty interest is at issue. Wolff v. McDonnell, 418 U.S. 539, 557 (1974). As noted previously, a liberty interest arises

14

when an atypical or significant hardship is imposed on the inmate. <u>Sandin</u>, 515 U.S. at 484. As a result of his convictions for the August 14, 2000 and September 2, 2000 incidents, Sadler was sentenced cumulatively to only a thirty day loss of television and radio privileges and 15 days isolation. Neither a loss of television and radio privileges nor the imposition of disciplinary isolation amount to an atypical prison condition. Therefore, Sadler was not entitled to any procedural safeguards during those institutional hearings and, thus, has failed to raise an issue of constitutional magnitude as to those charges or subsequent convictions.

However, as a result of Sadler's conviction for failing to obey a direct order to exit the shower stall and attempted assault on a correctional officer related to Sadler's resistance to being placed in restraints, both of which occurred on March 20, 2000, in addition to 12 days isolation, he was sentenced to lose 12 days of good time earned. Accordingly, Sadler was entitled to certain procedural safeguards during that hearing. <u>Wolff</u>, 418 U.S. at 570-71 (finding that when loss of statutory good time credits or some other liberty interest is at issue, an inmate is entitled to written notice of the charges, a written statement by the fact finders about the evidence relied on and reasons for their action, the opportunity to call witnesses and present evidence in his own defense, and a fair and impartial tribunal).

Sadler's institutional disciplinary records establish that Sadler had adequate notice of the charges, that he refused to accept a pre-hearing penalty offer on the charges, and at the institutional hearing he pled not guilty on both charges. Further, Sadler admits he was afforded an opportunity to present a 'self-defense' defense to the attempted assault charge. However, he alleges that he was denied the <u>Wolff</u> procedural protection of having his charges decided by a fair and impartial tribunal. Specifically, Sadler complains that the institutional disciplinary officer

15

presiding over this hearing was biased against him and would not have found him guilty or imposed such a sentence if she was not biased. In support of these allegations, Sadler points to his version of the confrontation on March 20, 2000, and Defendant Institutional Hearing Officer Slayer's statement, made after the hearing, that she did not "like inmates that assault her officers." However, Sadler admits that during the hearing he testified that on March 20, 2000, he knowingly and intentionally disobeyed a direct order to exit the shower stall and that shortly thereafter, while Count was fastening his wrist restraints to transport him to the segregation unit, he attempted to jerk his arms away from Count because he believed Count was excessively tightening the handcuffs. He further admits that Count offered testimony which supported the charge of attempted assault and contradicted Sadler's claim that he had used excessive force. Accordingly, Sadler's claim of bias amounts to nothing more that a complaint that Slayer found Count's testimony more credible that Sadler's, which alone is not evidence of bias. See Brown v. Angelone, 938 F.Supp. 340, 345 (W.D.Va. 1996)(finding that without more, an institutional hearing officer's determination of credibility or lack thereof, is not evidence of bias). Moreover, as Sadler admits that Slayer voiced her displeasure with inmates who assaulted correctional officers only after hearing the evidence, rendering a verdict, and issuing a sentence on both charges, the court finds her statement alone is insufficient to establish bias or prejudice during the institutional hearing.

Additionally, to the extent that Sadler's claims that there was insufficient evidence to convict him of any institutional infractions related to the events on March 20, 2000, August 14, 2000, and September 2, 2000, can be raised under the Due Process Clause, they too must fail. Federal courts will not review the accuracy of a disciplinary committee's findings of fact. Kelly

16

v. Cooper, 502 F. Supp. 1371, 1376 (E.D. Va. 1980). Such findings will only be disturbed if they are unsupported by any evidence or are wholly arbitrary and capricious. Smith v. Rabalais, 659 F.2d 539, 545 (5 th Cir. 1981), cert. denied, 455 U.S. 992 (1982). Sadler's own admissions make it clear that there was ample evidence to support a conviction on each disciplinary infraction.

As noted above, Sadler admits that on March 20, 2000, he intentionally and purposefully disobeyed a direct order to immediately exit the shower stall and pulled his arms away from Count, while Count was attempting to fasten the handcuffs on Sadler's wrists. Although Sadler alleges he yanked his arms from Count because he believed Count was using an excessive amount of force, the court has determined that Count used a reasonable amount of force and that there was no plausible basis for Sadler's resistance. Likewise, on August 14, 2000 and September 2, 2000, Sadler admits he disobeyed a direct order to shave. While, Sadler claims that he had a medical reason for disobeying those orders to shave, he admits the institutional physician refused to grant him a "no shave pass." Additionally, Sadler admits that he pushed the emergency call button in his cell on September 2, 2000, after being specifically instructed to only push that button if there was an emergency. Sadler admits that he pushed the emergency button once when his toilet cell began to overflow. Correctional officers testified that Sadler continued to push the emergency button after correctional officers had informed him that someone would be sent to his cell to fix the toilet. It is clear that there was sufficient evidence on which to convict Sadler on each disciplinary infraction.

Therefore, the undersigned finds that plaintiff has failed to establish any dispute of material fact as to his claims of institutional disciplinary hearing procedural violations and

17

retaliatory disciplinary charges and, further, finds that the defendants are entitled to judgment as a matter of law as to each of these claims.

## D.    Cleaning Solution Incident

Sadler alleges that on August 24, 2000, Correctional Officer King intentionally sprayed cleaning solution in his eyes. To the extent this claim can be construed to be an allegation of excessive force, it is without merit. As noted above, in order to establish an Eighth Amendment claim of excessive force, Sadler must establish that King acted  maliciously and sadistically for the very purpose of causing harm and that as a result Sadler suffered something more than a de minimis injury or that the force used was "repugnant to the conscience of mankind." Norman v. Taylor, 25 F.3d at 1263.

According to Sadler, King sprayed cleaning solution in his eyes which caused a burning sensation to Sadler's face and one of his eyes. However, Sadler's medical records establish that he had no real injury. Sadler was immediately examined after the alleged incident, and a nurse noted that Sadler was alert, appeared to be in no obvious discomfort, his eyes were clear, and specifically denied having blurred vision. Sadler was instructed to rinse his eyes with water, and notify nursing staff of any further problems. However, Sadler made no additional complaints regarding eye discomfort. Accordingly, the court finds that any injury Sadler alleges to have suffered as a result of the incident is de minimis and does not amount to a constitutional violation.  See Stanley, 134 F.3d at 637-38.

Furthermore, Sadler  has failed to allege any facts which establish those extraordinary circumstances on which a plaintiff can prevail on an excessive force claim when he suffers only

18

de minimis injury. Taylor, 155 F.3d at 483. "[N]ot...every malevolent touch by a prison guard gives rise to a federal cause of action." Riley v. Dorton, 115 F.3d 1159, 1167 (4th Cir. 1997). And, merely a lack of due care for the prisoner's interests and safety fails to show the use of force which is "repugnant to the conscience of mankind." See Whitley v. Albers, 475 U.S. 312, 319 (1986)(finding that the infliction of pain in the course of a prison security measure, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense).

Defendants assert that any cleaning solution which may have been sprayed into Sadler's eyes was inadvertent. Specifically, defendants aver that during the incident in question, institutional staff were dispensing cleaning solution to inmates. Segregation inmates, like Sadler, are not permitted to have cleaning solution in their cell, but are permitted to keep a cleaning sponge in their cell. When an inmate needs cleaning solution, institutional staff spray cleaning solution onto the inmate's sponge through the tray slot in the door. Accordingly, defendants assert that any solution which may have been sprayed in Sadler's eyes was unintentional and the cleaning solution was actually directed towards the sponge. Although Sadler complains that King sprayed cleaning solution in his face, he does not deny the defendants' assertion that during the alleged incident, staff were dispensing cleaning solution to inmates through the cell door tray slot onto each inmate's personal cell cleaning sponge. Accordingly, in order for Sadler to have been sprayed in the eyes with cleaning solution, he must have positioned his head at the tray slot level, have been looking directly through the tray slot, and remained in that position while King allegedly sprayed the cleaning solution into the cell. Sadler makes no such claim.

19

Further, even assuming that when the cleaning solution was sprayed onto Sadler's sponge and some solution inadvertently rebounded into his eyes, the undersigned finds that this does not amount to a 'repugnant' act or use of force. See Taylor, 155 F.3d at 483. At most, the alleged incident shows merely a lack of due care for Sadler's safety and/or health, which is not actionable under the Eighth Amendment. See Whitley v. Albers, 475 U.S. at 319.

## IV.

Under 28 U.S.C. § 1915A(b)(1), the court may dismiss a complaint as frivolous or malicious if the court finds the complaint is based on indisputably meritless legal theories or claims whose factual contentions are clearly baseless. Nasim v. Warden, Maryland House of Corrections, 64 F.3d 951, 955 (4th Cir. 1995). As described above, the record reflects that plaintiff's claims are without legal merit. Sadler's factual allegations are nothing more than exaggerated claims related to the defendants' reasonable and expected response to situations Sadler created. Thus, there exists no factual basis for his claims. Accordingly, it is recommended that this action be dismissed as frivolous pursuant to 28 U.S.C.§ 1915A(b)(1) and this action be deemed a "strike" under 28 U.S.C. § 1915(g).

## V.

For the reason stated above, the court finds that the plaintiff has failed to present any issue of material fact and that the defendants are entitled to judgment as a matter. Accordingly, it is recommended that the defendant's motion for summary judgment be granted. It is further recommended that this action be dismissed as frivolous, as it fails to state a cause of action on

which relief can be granted, and therefore, that dismissal should be considered a "strike" pursuant to 28 U.S.C. § 1915(g).

The clerk is directed to immediately transmit the record in this case to the Honorable Samuel G. Wilson, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note objections, if they have any, to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusions of law rendered herein by the undesigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C § 636(b)(1) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by the reviewing court as a waiver of such objection.

Further, the Clerk is directed to send a certified copy of this Report and Recommendation to all counsel of record.

Entered this _12_ day of April, 2006.

Michael F. Urbanski
United States Magistrate Judge

21